# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

KENNETH M. STERN,

      Plaintiff,

   v.

DOES, et al.,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)

Case No. CV 09-01986 DMG (PLAx)

**ORDER RE DEFENDANTS'
MOTIONS FOR SUMMARY
JUDGMENT AND REQUESTS FOR
ATTORNEYS' FEES**

   This matter is before the Court on Defendants' Motions for Summary Judgment and Requests for Attorneys' Fees. A hearing was held on January 28, 2011. Having duly considered the respective positions of the parties, as presented in their briefs and at oral argument, the Court now renders its decision. For the reasons set forth below, Defendants' Motions and Requests are GRANTED in part and DENIED in part.

## I.
## PROCEDURAL HISTORY

   Plaintiff filed this action on March 24, 2009 and the operative Second Amended Complaint [Doc. #38] on September 11, 2009. On January 6, 2010, this Court, the Hon. George H. King, presiding, granted Defendants' motions to dismiss all claims except Plaintiff's fifth cause of action for copyright infringement [Doc. #68]. On April 8, 2010,

the Court granted Plaintiff's request to dismiss all defendants except for Robert and Sara Weinstein [Doc. #90].

Defendant Robert Weinstein filed a Motion for Summary Judgment and Request for Attorneys' Fees [Doc. #126] on October 8, 2010.  Plaintiff filed his Opposition [Doc. #133] on October 29, 2010 and Defendant Robert Weinstein filed his Reply [Doc. #139] on November 12, 2010.

On November 11, 2010, Defendant Sara Weinstein filed a Motion for Summary Judgment and Request for Attorneys' Fees [Doc. #138].  Plaintiff filed his Opposition [Doc. #144] on December 2, 2010.  Defendant Sara Weinstein filed her Reply [Doc. #147] on December 17, 2010.

The Court requested further briefing on the issue of fair use [Doc. #171].  On January 19, 2011, supplemental briefs were filed by Plaintiff [Doc. #178], Defendant Robert Weinstein [Doc. #175], and Defendant Sara Weinstein [Doc. #176].  In addition, Defendant Sara Weinstein filed a Request for Judicial Notice [Doc. #177].  Plaintiff filed an Opposition to Defendant Sara Weinstein's Request for Judicial Notice [Doc. #179] on January 24, 2011.[1]

## II.

## FACTUAL BACKGROUND

In setting forth the facts underlying this dispute, the Court draws exclusively from Plaintiff's version of events, resolving all disputed facts in Plaintiff's favor and assuming without deciding that Defendants' evidentiary objections are to be overruled.

Plaintiff is an attorney.   In September 2006, Plaintiff retained the forensic accounting firm White, Zuckerman, Warsavsky, Luna, Wolf & Hunt L.L.P. ("White Zuckerman") to perform a mathematical calculation on behalf of one of his clients.  (2nd Am. Compl. ¶ 25.)  In March 2007, after receiving a bill from White Zuckerman for this

---

[1] The Court agrees with Plaintiff that the Request for Judicial Notice is immaterial to the instant litigation.  The Court has not considered it for any purpose.

work, Plaintiff became concerned that the billed hours were excessive and that White Zuckerman had been churning his client's file.  (*Id.* ¶¶ 27-28.)

On March 26, 2007, Plaintiff sent an e-mail to the Consumer Attorneys Association of Los Angeles ("CAALA") listserv, which stated in its entirety as follows: "Has anyone had a problem with White, Zuckerman . . . cpas including their economist employee Venita McMorris over billing or trying to churn the file?"[2]  (SW Opp'n, Stern Decl. ¶ 3 (ellipsis in original).)[3]  This statement—the subject of Plaintiff's copyright infringement claim—was posted on the CAALA listserv.  (*Id.*)

At the time, both Plaintiff and Defendant Robert Weinstein were members of the CAALA listserv.  (2nd Am. Compl. ¶¶ 16-17.)  Robert Weinstein accessed the CAALA listserv e-mails containing Plaintiff's writing, which he forwarded in an e-mail to his sister, Defendant Sara Weinstein, who was a client of White Zuckerman.  Sara Weinstein then forwarded the e-mail containing Plaintiff's writing to White Zuckerman.[4]  (*Id.* ¶¶ 41-42; McMorris Depo. at 9:17-10:16.)  On September 5, 2009, the United States Copyright Office issued Plaintiff a certificate of registration for his listserv post.  (RW Opp'n, Ex. 2.)

Plaintiff asserts that he holds a valid copyright and that Defendants' acts—copying and distributing his listserv post—constituted both copyright infringement and contributory infringement.  (2nd Am. Compl. ¶¶ 136, 140; RW Opp'n, Stern Decl. ¶ 17.)

---

[2] The Court reproduces the whole of Plaintiff's e-mail so that the ensuing discussion of originality and fair use is not hopelessly abstract.  The Court's "unauthorized reproduction" of Plaintiff's copyrighted work is, as Judge Posner has succinctly put it, "a good example of the fair-use doctrine in action."  *Ty, Inc. v. Publ'ns Int'l Ltd.*, 292 F.3d 512, 519 (7th Cir. 2002).

[3] Citations to the record prefaced with "RW" refer to documents filed in support of or in opposition to Defendant Robert Weinstein's Motion for Summary Judgment.  Similarly, citations prefaced with "SW" refer to documents associated with Defendant Sara Weinstein's Motion.

[4] Plaintiff appears open to the possibility that Defendants transmitted his listserv post to White Zuckerman in some other manner.  (*See, e.g.*, 2nd Am. Compl. ¶ 41.)  Because the Court ultimately finds that any copying and distribution of Plaintiff's writing was fair use, the exact method of its transmission is immaterial.  Defendant Robert Weinstein does not concede and Defendant Sara Weinstein disputes that any transmission occurred.

### III.

### __LEGAL STANDARD__

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Munoz v. Mabus*, __ F.3d __, 2010 WL 5263141, at *2 (9th Cir. Dec. 27, 2010). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(c), (e) (1986)); *see also Norse v. City Of Santa Cruz*, __ F.3d __, 2010 WL 5097749, at *4 (9th Cir. Dec. 15, 2010) (*en banc*) ("Rule 56 requires the parties to set out facts they will be able to prove at trial."). "[T]he inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

When a defendant challenges the quantum of the plaintiff's originality or creativity as a matter of law, "these matters should be resolved solely by the judge." 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 12.10[B][1] (rev. ed. 2010) (citing *Collezione Europa U.S.A., Inc. v. Hillsdale House, Ltd.*, 243 F. Supp. 2d 444, 452 (M.D.N.C. 2003)); *see also Pivot Point Int'l, Inc. v. Charlene Prods., Inc.*, 932 F. Supp. 220, 225 (N.D. Ill. 1996) (Easterbrook, J., sitting by designation) (holding that copyrightability is a question of law for a court to decide). Fair use presents a mixed

question of law and fact that a district court may resolve when the parties "dispute only the ultimate conclusions to be drawn from the admitted facts." *Fisher v. Dees*, 794 F.2d 432, 436 (9th Cir. 1986).

# IV.

## DISCUSSION

### 知可以戰與不可以戰者勝 [5]

### A.   Plaintiff Cannot Enforce The CAALA Listserv Confidentiality Agreement

At first blush, Plaintiff's Second Amended Complaint presents a garden variety infringement claim.   Plaintiff muddies the waters somewhat by relying in part on provisions of the CAALA listserv agreement:

> [I]t is my position the infringement has occurred, because my writing is copyrightable, and posted to the CAALA listserv, which constitutes a license, which defendant Robert Weinstein was required to sign to be a member of the listserv, that my writing may only be copied and distributed within the parameters of the CAALA listserve [sic] agreement, and as my writing, with my consent.   That parameter is that any copying and distribution must be solely within a posting to the CAALA listserv.   Any copying and distribution, as occurred herein, outside of the CAALA listserv is a breach of the licensing agreement, and my right to determine who may, and under what circumstances, copy and distribute his writing, thus, a copyright violation.

(RW Opp'n, Stern Decl. ¶ 17.)

Plaintiff's copyright claims cannot rely on provisions in the CAALA listserv agreement.   As an initial matter, the listserv agreement is not a single agreement.   Rather, it is a series of agreements between the CAALA and each individual member of the

---

[5] "He will win who knows when to fight and when not to fight."  Sun Tzu, *The Art of War* 32-33 (Lionel Giles trans., Ulysses Press 2007).

listserv.  Thus, Plaintiff can only enforce provisions of the agreement between the CAALA and Defendant Robert Weinstein if Plaintiff is an intended third-party beneficiary of that agreement.  *See Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 681 (9th Cir. 2009).  He is not.

Under California contract law, "a purported third-party beneficiary must show that the contract was 'made expressly for the benefit of a third person'"—as opposed to the case where the third person is merely an "incidental" beneficiary.  *Trs. of Screen Actors Guild—Producers Pension & Health Plans v. NYCA, Inc.*, 572 F.3d 771, 779 (9th Cir. 2009) (quoting Cal. Civ. Code § 1559; citing *Spinks v. Equity Residential Briarwood Apartments*, 171 Cal. App. 4th 1004, 1021-22, 90 Cal. Rptr. 3d 453 (2009)).  Here, it is clear that Plaintiff is only an incidental beneficiary of the agreement between Defendant Robert Weinstein and the CAALA.

Although the CAALA listserv rules require confidentiality, the purpose of this requirement is concern over CAALA's potential liability when a member's client's confidential information is compromised—not concern over the member's work product or intellectual property rights.  This purpose is apparent from CAALA's disclaimer of any liability due to breaches of confidentiality:  "You agree, as a condition of membership in the CAALA Listserv, to assume all responsibility for the breach of any confidentiality that may occur as a result of your posting information on the Listserv, and you acknowledge that CAALA cannot and does not act as a guarantor of such confidentiality."  (RW Opp'n, Ex. 1 at 2.)  Moreover, the listserv rules provide for their enforcement only by the CAALA Executive Director, Executive Committee members, and/or Board of Governors.  (*Id.* at 3-4.)  Conspicuously absent is any provision allowing for enforcement of the rules by individual listserv members.

Thus, Plaintiff is only an incidental beneficiary of the agreement between Defendant Robert Weinstein and the CAALA.  As such, he cannot enforce its confidentiality provisions.  That Robert Weinstein allegedly violated the listserv

agreement is not entirely immaterial; as discussed below, it is one factor to be considered in the fair use analysis.  It is not, however, an independent basis for liability.

**B.**   **Plaintiff's Listserv Post Is Not Copyrightable Because It Lacks Originality**

      **1.**   **The Originality Standard**

The Copyright Act protects only "*original* works of authorship."  17 U.S.C. § 102(a) (emphasis added).  The originality requirement derives from the Constitution, which, "by securing for limited Times to Authors . . . the exclusive Right to their . . . Writings," U.S. Const. art. I, § 8, cl. 8, "presuppose[s] a degree of originality."  *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 346, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991) (citing *The Trade-Mark Cases*, 100 U.S. 82, 25 L.Ed. 550 (1879); *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 4 S.Ct. 279, 28 L.Ed. 349 (1884)).

Originality does not require uniqueness.  "'Original' in reference to a copyrighted work means that the particular work 'owes its origin' to the 'author.'  No large measure of novelty is necessary."  *Alfred Bell & Co. v. Catalda Fine Arts*, 191 F.2d 99, 102 (2d Cir. 1951) (quoting *Burrow-Giles*, 111 U.S. at 57-58; footnote omitted).  Thus, "originality for copyright purposes amounts to 'little more than a prohibition of actual copying.'"  1 Nimmer, *supra*, § 2.01[B] (quoting *Alfred Bell*, 191 F.2d at 103; ellipsis omitted); *accord Swirsky v. Carey*, 376 F.3d 841, 851 (9th Cir. 2004).  Here, there is no question that Plaintiff's listserv post is his independent creation.

Nonetheless, to be copyrightable, a work must exhibit some minimal level of creativity.  While "the amount of creative input by the author required to meet the originality standard is low, it is not negligible."  *Satava v. Lowry*, 323 F.3d 805, 810 (9th Cir. 2003); *see also Feist*, 499 U.S. at 346 (explaining that "originality requires independent creation plus a modicum of creativity").  "The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be."  *Feist*, 499 U.S. at 345 (quoting 1 Nimmer, *supra*, § 1.08[C][1] (1990)).  There is, however, a "narrow category of works in which the creative spark is utterly lacking or so trivial as to be virtually nonexistent."  *Urantia Found. v. Maaherra*,

114 F.3d 955, 959 (9th Cir. 1997) (quoting *Feist*, 499 U.S. at 359; quotation marks omitted).

Plaintiff's certificate of registration raises the presumption that his work is original and his copyright valid.  *See Dream Games of Ariz., Inc. v. PC Onsite*, 561 F.3d 983, 987 n.2 (9th Cir. 2009); *Swirsky*, 376 F.3d at 851 (citing 17 U.S.C. § 410(c)).[6]   This presumption is rebuttable upon a showing that the listserv post is not original.  *Swirsky*, 376 F.3d at 851 (citing *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 489 (9th Cir. 2000)).

### 2.    The Originality Of A Single Sentence

The parties dispute whether Plaintiff's one-sentence listserv post contains the "modicum of creativity" necessary to satisfy the originality requirement.[7]   Generally, "if any author's independent efforts contain sufficient skill to motivate another's copying, there is *ipso facto* a sufficient quantum of originality to support a copyright."  1 Nimmer, *supra*, § 2.01[B] (citing, *inter alia*, *Drop Dead Co. v. S.C. Johnson & Son, Inc.*, 326 F.2d 87 (9th Cir. 1963); emphasis omitted); *see also Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 252, 23 S.Ct. 298, 47 L.Ed. 460 (1903) (finding that works' worthiness of copyright protection was "sufficiently shown by the [defendant's] desire to reproduce them without regard to the plaintiffs' rights").  Here, as discussed more fully below in the context of fair use, Defendants allegedly copied Plaintiff's writing not to appropriate any purported creativity of expression but to convey the *fact* that Plaintiff had

---

[6] The Copyright Act provides that "[i]n any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute *prima facie* evidence of the validity of the copyright."  17 U.S.C. § 410(c).  Plaintiff registered his work within this time period.

[7] Plaintiff begins his argument rhetorically, querying whether the following sentence is copyrightable:  "To be, or not to be, that is the question?"  (RW Opp'n at 1 (quoting William Shakespeare, *Hamlet* act 3, sc. 1).)  Perhaps, a more appropriate play from which to draw quotations would be *Much Ado About Nothing*.

expressed this particular message.   Under these circumstances, Defendants' alleged copying of Plaintiff's listserv post is not evidence of the post's creativity.

"It is axiomatic that copyright law denies protection to 'fragmentary words and phrases' and to 'forms of expression dictated solely at functional considerations' on the grounds that these materials do not exhibit the minimal level of creativity necessary to warrant copyright protection." *CMM Cable Rep, Inc. v. Ocean Coast Props., Inc.*, 97 F.3d 1504, (1st Cir. 1996) (quoting 1 Nimmer, *supra*, § 2.01[B] (1995)); *see also* 37 C.F.R. § 202.1(a) (exempting from copyright protection "[w]ords and short phrases such as names, titles, and slogans").

Plaintiff gainsays the characterization of his listserv post as a "phrase," describing it instead as a "sentence."[8]  (RW Opp'n at 8.)  "Phrase" is a nebulous concept that may or may not include an entire sentence, depending on context, and the divergent outcomes in the few cases to attempt such a classification reflect this conceptual amorphousness. *Compare Murray Hill Publ'ns, Inc. v. ABC Commc'ns, Inc.*, 264 F.3d 622, 627, 633 (6th Cir. 2001) (finding the following three sentences to be a "phrase or slogan not worthy of copyright protection in its own right":  "Good morning, Detroit.  This is J.P. on JR in the A.M.  Have a swell day."), *abrogated on other grounds*, *Reed Elsevier, Inc. v. Muchnick*, __ U.S. __, 130 S.Ct. 1237, 176 L.Ed.2d 17 (2009), *with Applied Innovations, Inc. v. Regents of the Univ. of Minn.*, 876 F.2d 626, 635 (8th Cir. 1989) ("The test statements are short, simple, declarative sentences [such as "I am a good mixer" and "No one seems to understand me"], but they are not merely fragmentary words and phrases within the meaning of 37 C.F.R. § 202.1(a).  They are not names or titles or slogans.").

Ultimately, the distinction between sentence and phrase is immaterial to the originality analysis.   The focus must remain on the presence of creativity.   While a

---

[8] That the sentence at issue is a question rather than a statement does not alter the analysis.  *See, e.g.*, *Rubin v. Boston Magazine Co.*, 645 F.2d 80, 83 (1st Cir. 1981) ("Since the term 'writings,' as used in the Constitution and in the [Copyright Act of 1909], is intended to be read expansively, the term covers sets of questions as well as other forms of expression." (citations omitted)).

-9-

shorter work, *ceteris paribus*, is less likely to possess the creative spark necessary to be accorded copyright protection, that will not always be the case.  A single sentence may be singular.  As the Sixth Circuit explained in the context of computer code,

> we do not mean to say that brief computer programs are ineligible for copyright protection.  Short programs may reveal high levels of creativity and may present simple, yet unique, solutions to programming quandaries. Just as a mathematician may develop an elegant proof, or an author may express ideas in a spare, simple, but creative manner, *see, e.g.*, e.e. cummings [sic[9]], Selected Poems (Richard S. Kennedy ed., 1994), so a computer programmer may develop a program that is brief *and* eligible for protection.  But unless a creative flair is shown, a very brief program is less likely to be copyrightable because it affords fewer opportunities for original expression.

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 542-43 (6th Cir. 2004) (citing 1 Nimmer, *supra*, § 2.01[B]); *see also Universal Athletic Sales Co. v. Salkeld*, 511 F.2d 904, 908 (3d Cir. 1975) ("It appears . . . that there is a reciprocal relationship between creativity and independent effort.  The smaller the effort (*e.g.* two words) the greater must be the degree of creativity in order to claim copyright protection." (quoting Nimmer)).

### 3.    Plaintiff's Sentence Lacks Creativity

Thus, the copyrightability of a very short textual work—be it word, phrase, sentence, or stanza—depends on the presence of creativity.  The opening sentence of a poem may contain sufficient creativity to warrant copyright protection whereas a more prosaic sentence of similar length  may not.  *See Narell v. Freeman*, 872 F.2d 907, 911-

---

[9]  Notwithstanding his unconventional use of minuscules and majuscules, E.E. Cummings preferred that his name appear traditionally, *i.e.*, with the initial letters capitalized.  *See* Norman Friedman, *Not "e.e. cummings" Revisited*, 5 Spring:  J. E.E. Cummings Soc'y 41 (1996), http://www.gvsu.edu/english/cummings/caps2.html.

12 (9th Cir. 1989).  For instance, the opening stanza/sentence of the poem *Jabberwocky* contains, coincidentally, the same number of words—23—as Plaintiff's listserv post: "'Twas brillig, and the slithy toves / Did gyre and gimble in the wabe; / All mimsy were the borogoves, / And the mome raths outgrabe."  Lewis Carroll, *Through the Looking-Glass and What Alice Found There*, *in The Annotated Alice: The Definitive Edition* 148 (Martin Gardner ed., W.W. Norton & Co. 2000) (1871).  The utter creativity of this "greatest of all nonsense poems in English," *id.* at 149 n.16, prompted one court to suggest that even its first line would be entitled to copyright protection.  *See Heim v. Universal Pictures Co.*, 154 F.2d 480, 487 n.8 (2d Cir. 1946).[10]

Plaintiff's listserv post, in contrast, displays no creativity whatsoever—its content is dictated solely by functional considerations.  Plaintiff merely requested factual information:  whether anyone on the listserv had a bad experience with a certain forensic accounting firm—and one employee in particular—regarding overbilling and the churning of client files.  His single sentence conveys precisely this idea and no more.  As Plaintiff's expression of his idea is indistinguishable from the idea itself, it is not entitled to copyright protection.  *See Dream Games*, 561 F.3d at 988 ("Because copyright protects only an author's expression of an idea, elements of expression that necessarily follow from an idea, or expressions that are as a practical matter, indispensable or at least standard in the treatment of a given idea are not protected." (quotation marks, citations, and ellipsis omitted)); *Allen v. Academic Games League of Am., Inc.*, 89 F.3d 614, 617 (9th Cir. 1996) (explaining that "where an idea contained in an expression cannot be communicated in a wide variety of ways," as is often the case with factual works, "the notions of idea and expression may merge from such 'stock' concepts that even verbatim reproduction of a factual work may not constitute infringement").

---

[10] *Heim* concerned the extent of copying necessary to establish infringement rather than copyrightability.  *See* 1 Nimmer, *supra*, § 2.01[B] n.41.  Nonetheless, an infringement finding presupposes originality.

-11-

In an effort to show that his sentence involved creative effort, Plaintiff points out several alternative formulations that he considered and rejected.  (*See* RW Opp'n, Stern Decl. ¶ 7.)  The fact that Plaintiff could have varied his sentence in trivial ways, however, does not mean that his particular choice of words is original.

> When the uncopyrightable subject matter is very narrow, so that the topic necessarily requires, if not only one form of expression, at best only a limited number, to permit copyrighting would mean that a party or parties, by copyrighting a mere handful of forms, could exhaust all possibilities of future use of the substance.  In such circumstances it does not seem accurate to say that any particular form of expression comes from the subject matter.  However, it is necessary to say that the subject matter would be appropriated by permitting the copyrighting of its expression.  We cannot recognize copyright as a game of chess in which the public can be checkmated.

*Morrissey v. Procter & Gamble Co.*, 379 F.2d 675, 678-79 (1st Cir. 1967) (internal quotation marks and citations omitted), *cited with approval in Allen*, 89 F.3d at 617-18; *cf. Lamps Plus, Inc. v. Seattle Lighting Fixture Co.*, 345 F.3d 1140, 1147 (9th Cir. 2003) ("[A] combination of unprotectable elements is eligible for copyright protection only if those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship." (quoting *Satava*, 323 F.3d at 811)).

Furthermore, the variations that Plaintiff considered involved not just different expressions but also different underlying ideas.  For instance, Plaintiff considered asking about either churning or overbilling but not both.  (RW Opp'n, Stern Decl. ¶ 7(a).)  Yet, churning is not the same thing as overbilling and asking about one or the other is substantively different than asking about both.  In any event, with two exceptions, none of the alternative formulations that Plaintiff considered possesses originality because in each case the expression is indistinguishable from the idea.

Plaintiff's final two examples (*id*. ¶ 7(c)), although they too express different ideas than the writing at issue, *do* possess some minimal creative effort insofar as Plaintiff selected the particular evidence to cite when asking whether his fellow listserv members thought it constituted churning or overbilling.  Had Plaintiff in fact posted either of these paragraphs to the listserv, he would now have a much stronger argument for originality. The fact that Plaintiff *could* have expressed his idea in such a way as to warrant copyright protection, however, has no bearing on whether his *actual* expression is copyrightable.  A court could deny protection, for instance, to the headline "Pedophile Kidnaps Teenage Girl, Goes To Jail" without calling into doubt Vladimir Nabokov's copyright in *Lolita*.

The instant case is similar to *CMM Cable Rep*, which involved a brochure for a radio station's on-air promotion.  The plaintiff's brochure contained several sentences and/or phrases, including the following:

> 3.  CALL IN, CLOCK IN & WIN!  When you hear your name, call:  (800) 749-9290 within 10 minutes and "clock in!"  Make $50 every hour until the next person whose name is announced calls in to replace you on the payroll. If you're still "on the clock" at quitting time, you'll start over at 7 a.m. the next workday making $50 per hour until you're replaced.

97 F.3d at 1533.  Viewing the text of the plaintiff's brochure as a whole, the First Circuit concluded that it "simply does not involve an appreciable amount of text or the minimal level of creativity necessary to warrant copyright protection."  *Id*. at 1520.   Like Plaintiff's listserv post, the brochure in *CMM Cable Rep* could have been reworded in several different ways—as evidenced by the defendant's extremely similar brochure—but the brevity of the text and its merger of expression and idea precluded copyrightability.

Plaintiff's reliance on *Applied Innovations* is misplaced.   As the foregoing discussion indicates, this Court has no disagreement with the Eighth Circuit's holding that short, declaratory sentences are not *per se* uncopyrightable.  876 F.3d at 635.  The facts of *Applied Innovations*, however, differ materially from those here.   *Applied Innovations* involved a set of test statements to which the test taker responded by

-13-

answering "true," "false," or "cannot say."  *Id*. at 628.  The Eighth Circuit found that these statements were copyrightable not as standalone sentences but "within the context of the administration of the [test]."  *Id*. at 635.  The individual test statements were carefully designed so as in the aggregate "to make objective assessments of major personality characteristics that affect professional and social adjustment, such as truthfulness, hypochondria, introversion, depression, and sexual orientation."  *Id*. at 628.  Thus, the individual statements did not merge with the underlying ideas being tested.  While concise, the statements could have been expressed in virtually unlimited ways.

In sum, the Court finds that Plaintiff's one-sentence listserv post is devoid of creative effort and therefore uncopyrightable.  Courts seldom resolve copyright infringement claims solely on that basis, however, in part because courts resist making aesthetic judgments for which they are ill-equipped.  *See Bleistein*, 188 U.S. at 250 ("It would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of [artistic works], outside of the narrowest and most obvious limits.").  For this reason, the Court asked the parties to provide additional briefing on the fair use doctrine.[11]  This doctrine provides an even stronger ground for granting summary judgment to Defendants because even if, *arguendo*, Plaintiff's expression is protectable, Defendants' alleged copying fits comfortably within the range of activities countenanced as fair use.

## C.    Defendants' Alleged Copying Of Plaintiff's Listserv Post Was Fair Use

A copyright holder's exclusive right to reproduce the copyrighted work is subject to a number of limitations, in particular fair use.  *See* 17 U.S.C. §§ 106, 107; *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 447, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984).  The Copyright Act does not define "fair use," which is at heart an "equitable rule of reason."  *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1399 (9th

---

[11] Defendants assert a fair use defense in their answers.  (RW Answer to 2nd Am. Compl. ¶ 68; SW Answer to 2nd Am. Compl. ¶ 52.)

-14-

Cir. 1997) (quoting *Sony Corp.*, 464 U.S. at 448).  Nevertheless, the Act lists as examples of fair use copying for such purposes as "criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research."  17 U.S.C. § 107. In determining whether a specific incidence of copying constitutes fair use, courts consider at least the four factors enumerated in the Copyright Act:

> (1)  the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2)  the nature of the copyrighted work;
>
> (3)  the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4)  the effect of the use upon the potential market for or value of the copyrighted work.

*Id.*

The fair use analysis is flexible, and a court may consider additional factors on a case-by-case basis.  *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 529 (9th Cir. 2008) (citing *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994)).  These factors are not considered in isolation but instead are weighed together "in light of the copyright law's purpose 'to promote the progress of science and art by protecting artistic and scientific works while encouraging the development and evolution of new works.'"  *Id.* (quoting *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 799-800 (9th Cir. 2003)).

### 1.    Purpose And Character Of Use

The first fair use factor requires consideration of the purpose and character of the allegedly infringing use.  This inquiry's "central purpose" is to determine whether and to what extent the challenged work is "transformative."  *Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701, 720 (9th Cir. 2007) (quoting *Campbell*, 510 U.S. at 579).  A work is "transformative" when it "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message."  *Campbell*, 510

U.S. at 579.  If, on the other hand, the work merely "supersede[s] the use of the original," then "the use is likely not a fair use."  *Perfect 10*, 487 F.3d at 720 (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 550-51, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985); quotation marks omitted).

### a.  Transformative Use

Defendants' use of Plaintiff's sentence is highly transformative.  Plaintiff's listserv post sought specific information about a forensic accounting firm's questionable business tactics.  Defendants did not seek any information at all; their purpose was to alert the company about Plaintiff's post.  By forwarding the post in e-mails, they conveyed the fact of the post rather than its underlying message.  Defendants' e-mails thus had a substantially different purpose than the post itself, a fact which weighs heavily in favor of fair use.  *See Perfect 10*, 487 F.3d at 721-22 ("[E]ven making an exact copy of a work may be transformative so long as the copy serves a different function than the original work."); *Wall Data Inc. v. L.A. County Sheriff's Dep't*, 447 F.3d 769, 778 (9th Cir. 2006) ("[T]he more transformative the new work, the less will be the significance of the other factors." (quoting *Campbell*, 510 U.S. at 579) (quotation marks omitted)).

### b.  Non-Commercial Use

Equally important is the non-commercial nature of Defendants' use.  *See Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1117 (9th Cir. 2000) ("[T]he absence of a commercial use . . . eliminates the presumption of unfairness.").  There is no evidence that Defendants stood to profit in any manner from their reproduction of Plaintiff's listserv post, let alone evidence that they intended to commercially exploit it.  Plaintiff alleges that Defendant Robert Weinstein and Sara Weinstein transmitted his listserv post to White Zuckerman to enhance their respective business relationships with the forensic accounting firm.  (2nd Am. Compl. ¶ 44.) Plaintiff fails to identify evidence supporting this allegation.

Regardless, even if true, the allegation does not undermine a finding of fair use. As discussed above, it was not Plaintiff's particular form of expression that would have

enhanced Defendants' business relationships; rather, it was the fact of his expression.  To the extent Defendants benefitted at all, they would have benefitted equally by simply telling White Zuckerman that Plaintiff was publicly requesting information from other White Zuckerman clients about negative experiences with the firm.  In this respect, Defendants' alleged transmission of data to White Zuckerman resembles activities such as "criticism, comment, [and] news reporting," 17 U.S.C. § 107, which are quintessentially fair uses.  To be considered "commercial" use, the use must "exploit[] the copyright for commercial gain—as opposed to incidental use as part of a commercial enterprise."  *Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 627 (9th Cir. 2003).  Thus, Defendants' use of Plaintiff's work was not commercial.

### c.    Violation Of The CAALA Listserv Agreement

"Because fair use presupposes good faith and fair dealing, courts may weigh the propriety of the defendant's conduct in the equitable balance of a fair use determination." *Fisher*, 794 F.2d at 436-37 (quoting *Harper & Row*, 471 U.S. at 562; 3 Nimmer, *supra*, § 13.05[A] (rev. ed. 1985)) (internal quotation marks, citations, and brackets omitted). Defendant Robert Weinstein's alleged violation of the CAALA listserv agreement is therefore relevant to the discussion because "[a] use that . . . clearly infringes the copyright holder's interests in confidentiality and creative control is difficult to characterize as 'fair.'"  *Harper & Row*, 471 U.S. at 564.

Concerns about confidentiality and creative control, however, lie primarily if not exclusively in the context of unpublished works.  *See id*. ("The fact that a work is unpublished is a critical element of its 'nature. . . .' [T]he scope of fair use is narrower with respect to unpublished works." (citation omitted)).  Plaintiff asserts publication at the time his e-mail was posted on the listserv.  (*See* RW Opp'n, Ex. 2 (listing March 26, 2007 as the date of first publication).)  Any confidentiality concerns based on post-publication copying from the listserv are greatly attenuated.  At bottom, Plaintiff's confidentiality concern is about the transmission of his unprotectable idea rather than the

disclosure of the manner in which he expressed it.  Such concerns are outside the purview of copyright law.

Defendants' highly transformative, non-commercial use of Plaintiff's work far outweighs the negligible harm to Plaintiff from violation of the CAALA's confidentiality provision.  Accordingly, the first fair use factor—the purpose and character of the use—substantially favors a fairness finding.

### 2.     Nature Of The Copyrighted Work

The next factor focuses on the work's nature.  "The more informational or functional the plaintiff's work, the broader should be the scope of the fair use defense." *Leadsinger*, 512 F.3d at 531 (quoting 4 Nimmer, *supra*, § 13.05[A][2][a]).  As discussed above in connection with originality, Plaintiff's one-sentence listserv post is entirely informational or factual in nature.  Plaintiff concedes that any copyright he holds is "thin."  (RW Opp'n at 2-3.)  On the whole, the second factor also supports a fair use finding.

### 3.     Amount And Substantiality Of The Portion Used

Generally, "wholesale copying of copyrighted material precludes application of the fair use doctrine."  *Marcus v. Rowley*, 695 F.2d 1171, 1176 (9th Cir. 1983); *see also Wall Data*, 447 F.3d at 780 (finding that "'verbatim' copying of the entire copyrighted work . . . weighs against a finding of fair use" (citing *Worldwide Church of God*, 227 F.3d at 1118)).  In *Sony Corp.*, the Supreme Court recognized that wholesale copying is not necessarily dispositive to fair use.  *See* 464 U.S. at 449-50 (observing that in the context of "timeshifting," *i.e.*, recording a television show for later viewing, "the fact that the entire work is reproduced does not have its ordinary effect of militating against a finding of fair use" (citation omitted)); *Hustler Magazine Inc. v. Moral Majority Inc.*, 796 F.2d 1148, 1155 (9th Cir. 1986) ("*Sony Corp.* teaches us that the copying of an entire work does not preclude fair use *per se*.").

In addition to the Supreme Court in *Sony Corp.*, several courts have accepted fair use defenses where the defendant copied all or most of the plaintiff's work.  *See, e.g.*,

-18-

*Bond v. Blum*, 317 F.3d 385, 396 (4th Cir. 2003) (holding that use of "all, or nearly all, of the copyrighted work" did not undermine the protections granted by the Copyright Act where the use "was not for its expressive content, but rather for its allegedly factual content"); *Triangle Publ'ns, Inc. v. Knight-Ridder Newspapers, Inc.*, 626 F.2d 1171, 1177 n.15 (5th Cir. 1980) ("[T]he idea that the copying of an entire copyrighted work can never be fair use 'is an overbroad generalization, unsupported by the decisions and rejected by years of accepted practice.'" (quoting *Williams & Wilkins Co. v. United States*, 487 F.2d 1345, 1353 (Ct. Cl. 1973))).

The facts of this case reveal it to be one of the limited situations where *verbatim* copying of an entire work is fair. There are two independent reasons why this is so. First, the "work" at issue is a 23-word sentence. It would be nearly impossible to excerpt this sentence for legitimate comment or criticism without reproducing it *in toto*. *See Belmore v. City Pages, Inc.*, 880 F. Supp. 673, 678-79 (D. Minn. 1995). In *Belmore*, the defendant copied the plaintiff's entire work, a short parable of approximately 677 words, surrounded by a brief commentary of approximately 202 words. *See id.* at 678-79, 681-82. Although the defendant had "originally intended to publish excerpts," it ultimately decided that because the work was "relatively short," reprinting the story as a whole was necessary "to ensure that [the defendant's] readers understood what [it] was criticizing." *Id.* at 679. Accepting this justification, the court held that the defendant's complete reproduction of the plaintiff's work "does not have significant weight" in the fair use analysis "when applied to the unique facts presented in this case." *Id.*

The copying of Plaintiff's entire sentence was also reasonable in light of the purpose for which it was reproduced—to alert White Zuckerman about Plaintiff's potentially libelous statement. *See Campbell*, 510 U.S. at 586-87 (recognizing that "the extent of permissible copying varies with the purpose and character of the use"). Plaintiff claims that Defendant Sara Weinstein sent an e-mail to an individual named Paul White at White Zuckerman containing the text of his listserv post and the introduction "PAUL, FOR YOUR INFO—SARA." (RW Opp'n, Stern Decl. ¶ 31, Ex. 5.) White Zuckerman

-19-

"made use of" Plaintiff's writing, "claiming that [P]laintiff had 'slandered' [White Zuckerman] to others, threatening to sue [P]laintiff . . . ."[12]  (2nd Am. Compl. ¶ 56.)

Reproduction of copyrighted material for use in litigation or potential litigation is generally fair use, even if the material is copied in whole.  For instance, in *Jartech, Inc. v. Clancy*, 666 F.2d 403 (9th Cir. 1982), the defendant city council copied five motion pictures by photographing the screen images every few seconds and recording the soundtracks in their entirety.  *Id.* at 405.  The city council used its copies in a nuisance abatement proceeding against an adult film theater.  *Id.* at 404-06.  The Ninth Circuit affirmed the jury's fair use finding, holding that the city council's use of the copies in the legal proceedings was not "the same intrinsic use to which the copyright holders expected protection from unauthorized use."  *Id.* at 407; *see also Bond*, 317 F.3d at 396 (holding that the defendant's use in a child custody proceeding of the plaintiff's entire copyrighted work—describing how the plaintiff killed his father—"does not undermine the protections granted by the [Copyright] Act but only serves the important societal interest in having evidence before the factfinder"); *Healthcare Advocates, Inc. v. Harding, Earley, Follmer & Frailey*, 497 F. Supp. 2d 627, 638 (E.D. Pa. 2007) (holding that law firm's copying of an entire set of copyrighted web pages was justified where the web pages were relevant evidence in other litigation).

In *Hustler*, a case highly relevant to the instant litigation, the plaintiff magazine published a parody featuring Reverend Jerry Falwell, a fundamentalist minister, "describing his 'first time' as being incest with his mother in an outhouse, and saying that he always gets 'sloshed' before giving his sermons."  796 F.3d at 1150.  Failing to appreciate the humor, Reverend Falwell and one of his co-defendants sent out copies of this parody to 26,000 major donors, seeking donations to help finance Falwell's lawsuit

---

[12] "Plaintiff beliefs [sic], when [White Zuckerman's employee] used the word slander, considering the context of the comment, she really meant liable [sic].  Confusing liable [sic] with slander is a mistake people commonly make."  (2nd Am. Compl. ¶ 56.)  Confusing "libel" with "liable" is also a commonly-made mistake.

against Hustler magazine for libel and related torts.  Hustler magazine then sued Falwell and the other defendants for copyright infringement.  *Id*. at 1150 & n.1.

The Ninth Circuit affirmed a fair use finding.  While acknowledging that the defendants copied the plaintiff's entire parody, the Ninth Circuit found their use reasonable:  "[A]n individual in rebutting a copyrighted work containing derogatory information about himself may copy such parts of the work as are necessary to permit understandable comment.  Falwell did not use more than was reasonably necessary to make an understandable comment when he copied the entire parody from the magazine." *Id*. at 1153.  It made no difference, the court explained, that the parody did not defame Falwell's co-defendants, because Falwell "used them as a medium to transmit his messages."  *Id*. at 1153 n.9.

Similarly here, Defendants acted on White Zuckerman's behalf when they allegedly copied and forwarded Plaintiff's negative and potentially defamatory statement about White Zuckerman.  (*See* 2nd Am. Compl. ¶ 83 ("By so accepting the benefits of Robert Weinstein and Sara Weinstein's wrongful conduct, and by using [P]laintiff's confidential email to threaten to sue him for slander, [White Zuckerman] thereby actually, apparently and impliedly gave Robert Weinstein and Sara Weinstein authority, to commit such wrongful conduct, on behalf of [White Zuckerman] as if they were originally authorized, by them, ab initio.").)

Although wholesale copying normally weighs against fair use, the extenuating circumstances here—the extreme brevity of the work at issue and the reasonableness of the purpose for which it was copied—render this third factor neutral in the overall fair use analysis.

### 4.    Effect Upon The Value Of The Copyrighted Work

Evaluating the fourth and final fair use factor—the effect of the infringing activity upon the Plaintiff's potential market for or value of the copyrighted work—is straightforward:  There is no effect.  Plaintiff's listserv post has no market value and Defendants' alleged copying and distribution in no way diminishes the intrinsic value of

the post to Plaintiff or other listserv users.  The only actual damages that Plaintiff alleges are the copyright registration fee, his time spent on the instant litigation, and pain, suffering, and emotional distress.  (*See* RW Opp'n at 20-24.)  Because Defendants' alleged infringement has no effect on the value of Plaintiff's listserv post, this factor strongly favors a fair use finding.

### 5.   Balancing The Factors

Each of the four factors either support Defendants' fair use defense or are neutral. This is unsurprising.  In an age of blogs, listservs, and other online fora, a person's short comment in cyberspace is frequently quoted in its entirety as others reply or forward it elsewhere.  It would be strange, dangerous even, if every such quotation subjected the copier to liability and a federal lawsuit.  Such heavy-handed tactics are akin to using a cannon to kill a mosquito; they carry the same attendant risk of collateral damage by chilling free speech.   A free and vibrant democracy depends upon the unfettered exchange of ideas.  *See Red Lion Broad. Co. v. F.C.C.*, 395 U.S. 367, 390, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969) ("It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, rather than to countenance monopolization of that market, whether it be by the Government itself or a private licensee.").

Even if Plaintiff had a thin copyright in his listserv post, Defendants' alleged use of it was fair.  Consequently, Defendants are entitled to summary judgment.

### D.   Attorneys' Fees

Both Defendants request attorneys' fees.  The Copyright Act of 1976 vests district courts with the discretion to award "a reasonable attorneys' fee to the prevailing party." *Love v. Associated Newspapers, Ltd.*, 611 F.3d 601, 614 (9th Cir. 2010) (quoting 17 U.S.C. § 505).  In deciding whether to award attorneys' fees, courts generally consider factors including "(1) the degree of success obtained; (2) frivolousness; (3) motivation; (4) the objective unreasonableness of the losing party's factual and legal arguments; and (5) the need, in particular circumstances, to advance considerations of compensation and

deterrence." *Id*. (citing *Jackson v. Axton*, 25 F.3d 884, 890 (9th Cir. 1994)).   An attorneys' fees award is reasonable if based on a reasonable number of hours expended and a reasonable hourly rate.  *See Fantasy, Inc. v. Fogerty*, 94 F.3d 553, 561 (9th Cir. 1996); *see also Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).  The Court considers each of the above-enumerated factors in turn.

### 1.   Defendants Are Entitled To Reasonable Attorneys' Fees And Costs

#### a.   Degree Of Success Obtained

Defendants successfully obtained judgment against Plaintiff on his remaining cause of action for copyright infringement.  Their success was total.  Thus, this factor favors a fee award.

#### b.   Frivolousness Or Objective Unreasonableness Of Plaintiff's Factual And Legal Arguments

Plaintiff asserts that his copyright claim was not frivolous because the Copyright Office issued a certificate of registration in his writing.  Plaintiff's copyright registration is relevant only to the validity of his copyright.  As discussed above, Plaintiff is incorrect about the validity of his copyright because his listserv post lacks originality.  Nonetheless, Plaintiff's originality argument was not objectively unreasonable.  The problem with Plaintiff's copyright claim lies in Defendants' obvious fair-use defense.  A reasonable person, particularly one who happens to be an attorney, would not have pursued such folderol.  Plaintiff's decision to proceed with this patently meritless cause of action supports a fee award.

#### c.   Plaintiff's Motivation

##### i.   Evidence Of Damages Or Other Potential Remedies

There is evidence that Plaintiff brought this suit—including the copyright claim—in bad faith.  First, there is a dearth of evidence that Plaintiff suffered actual damages.[13]

---

[13] Plaintiff is barred from seeking statutory damages because he failed to register his work prior to the alleged infringement or within three months of publication.  17 U.S.C. § 412.

The value of Plaintiff's purported copyright was not impaired.  Plaintiff's claims for other actual damages range from the implausible to the preposterous.   Implausible are Plaintiff's averments of emotional distress and stress-related ailments arising from Defendants' alleged infringement.   Plaintiff offers almost no evidence of these maladies. He states, incredibly, that "[i]n having to deal with the violation of my copyright, I have experienced aggravation of the then arthritis in my right hip, which resulted in excess pain in the hip and leg and a decrease in the range of motion in my leg and hip."  (RW Opp'n, Stern Decl. ¶ 13.)  In an equally conclusory fashion, he asserts emotional distress and insomnia. (*Id.* ¶ 14.)  Their dubiousness aside, none of these claims are compensable under the Copyright Act.  *See Mackie v. Rieser*, 296 F.3d 909, 917 (9th Cir. 2002) (holding that a plaintiff's subjective view about the harm from copyright infringement, "which really boils down to 'hurt feelings' over the nature of the infringement, has no place in [the damages] calculus"); *see also In re Dawson*, 390 F.3d 1139, 1146 n.3 (9th Cir. 2004) (construing *Mackie* as limiting actual damages under the Copyright Act to economic damages).

As for the time Plaintiff spent on the instant litigation, it would be compensable only if Plaintiff had the prospect of recovering attorneys' fees, which, as a *pro se* litigant, he did not.  *See Elwood v. Drescher*, 456 F.3d 943, 947 (9th Cir. 2006) (interpreting *Kay v. Ehrler*, 499 U.S. 432, 111 S.Ct. 1435, 113 L.Ed.2d 486 (1991), as "impos[ing] a general rule that pro se litigants, attorneys or not, cannot recover statutory attorneys' fees"); *see also Musaelian v. Adams*, 45 Cal. 4th 512, 517, 87 Cal. Rptr. 3d 475 (2009) ("The ordinary and usual meaning of 'attorney's fees,' in both legal and general usage, is the consideration a litigant actually pays or becomes liable to pay in exchange for legal representation.  An attorney litigating in propria persona pays no such compensation.").

That leaves only Plaintiff's outlandish suggestion that his $750 copyright registration fee constitutes actual damages.  Copyright registration is not mandatory. Congress, wishing to encourage the development of a robust federal register of copyrights, provides certain incentives to copyright registrants.  For instance, registration

is a prerequisite to a copyright infringement suit involving a U.S. work.  *See Cosmetic Ideas, Inc. v. IAC/Interactivecorp.*, 606 F.3d 612, 619 (9th Cir. 2010).  Thus, registration fees are not "damages"; rather, they are fees copyright holders pay to obtain certain additional rights, such as the right to sue.  As such, they are not recoverable.

The absurdity of Plaintiff's position becomes apparent when one considers the more typical infringement case where an author has a legitimate copyright in a work with some commercial value.  In such cases, infringement is often committed on different occasions by more than one party.  Allowing recovery of registration fees would arbitrarily and unfairly punish the party that the author chose to sue first—not necessarily the first party to infringe.  To the extent the first party found liable even became aware of subsequent liable parties, it would have no effective recourse against them.  Exercising the right to contribution on a $750 fee award, assuming such a right existed, would be economically impractical.

In addition to actual damages, Plaintiff maintains that he is entitled to injunctive relief.  Overlooking the frivolousness of this lawsuit, discussed *supra*, the potential for injunctive relief might have provided justification for bringing Plaintiff's copyright claim were there a probability of continued "infringement."  But Plaintiff provides no evidence that Defendants are likely to commit further acts of alleged infringement.  Indeed, it is highly unlikely that Defendants will have reason to forward Plaintiff's listserv post to White Zuckerman or anyone else in the future.

Because Plaintiff had no compensable damages and no reason to seek injunctive relief, the Court concludes that he brought his copyright claim in bad faith.  This conclusion is bolstered by Plaintiff's delay in providing Defendants with a copy of the listserv post.

### ii.   Plaintiff's Delay In Turning Over His Listserv Post

"[M]any actions are extended unnecessarily by lawyers who exploit or abuse judicial procedures, especially the liberal rules for pretrial discovery."  *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 757 n.4, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980).  This case

easily could have been resolved on a motion to dismiss had Plaintiff disclosed the content of his listserv post at the outset.  By withholding disclosure of this information until August 2010 (*see* RW Mot., Farrell Decl. ¶ 2), Plaintiff substantially prolonged this litigation.

Plaintiff asserts that he would have turned over his listserv post sooner if Defendants had agreed to provide a protective order.  (RW Opp'n, Stern Decl. ¶ 24.)  This assertion strains credulity.  Rule 26(c)(1) allows a court to enter a protective order "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."  Plaintiff does not show how Defendants' unfettered access to his listserv post falls into any of these categories.  Nor can Plaintiff's listserv post be described as "a trade secret or other confidential research, development, or commercial information."  Fed. R. Civ. P. 26(c)(1)(G).

Throughout this litigation, Plaintiff has inaptly described the listserv post as his "work product."  (*See, e.g.*, RW Opp'n, Stern Decl. ¶ 24.)  "The work product doctrine is a 'qualified privilege' that protects 'certain materials prepared by an attorney acting for his client in anticipation of litigation.'"  *Hernandez v. Tanninen*, 604 F.3d 1095, 1100 (9th Cir. 2010) (quoting *United States v. Nobles*, 422 U.S. 225, 237-38, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975)).  Plaintiff's query to the CAALA listserv cannot reasonably be construed as material prepared on behalf of a client in anticipation of litigation.  It is better characterized as material prepared on his own behalf incidental to the litigation whence it arose.  It is thus no more an example of work product than if Plaintiff's printer had jammed while printing out a client's brief and Plaintiff had inquired on the listserv whether other attorneys had experienced similar difficulties with that particular model.

Even if, for the sake of argument, the listserv post did constitute Plaintiff's work product, Plaintiff unquestionably waived its protection.  Plaintiff shared his question with approximately 2,300 other attorneys on the CAALA listserv and registered it with the Copyright Office.  Furthermore, by filing the instant lawsuit, Plaintiff waived any work product claim in the listserv post because he should have known that its disclosure would

be necessary.  *See Hernandez*, 604 F.3d at 1100 ("[R]aising a claim that requires disclosure of a protected communication results in waiver as to all other communications on the same subject."); *cf. Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) ("Where a party raises a claim which in fairness requires disclosure of the protected communication, the [attorney-client] privilege may be implicitly waived.").

Plaintiff's obstructionist tactics, such as filing two unfounded applications to seal [Doc. ##41, 84-85], are not surprising given his apparent litigation goal of obtaining discovery.  Nonetheless, they wasted Defendants' time and money defending this action as well as scarce judicial resources.  They are yet another example of Plaintiff's bad faith.

### d.    Compensation And Deterrence

Awarding attorneys' fees to a prevailing defendant in a copyright infringement suit may compensate the defendant, but it may also deter the very creativity that the Copyright Act seeks to promote by providing copyright holders with disincentives to enforce their rights and thereby undermining the value of copyright protection.  These concerns are not present here, however, because Plaintiff's one-sentence listserv post was not a creative work and has no commercial value.

Discouraging frivolous lawsuits would not erode the value of copyright protection.  Furthermore, lawsuits of this nature have a chilling effect on creativity insofar as they discourage the fair use of existing works in the creation of new ones.  *See Feist*, 499 U.S. at 349-50 ("The primary objective of copyright is not to reward the labor of authors, but '[t]o promote the Progress of Science and useful Arts.'  To this end, copyright assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work." (quoting U.S. Const., Art. I, § 8, cl. 8) (internal citations omitted)).  Therefore, considerations of compensation and deterrence also weigh in favor of an award.

### e.     Balancing The Factors

Although all four factors favor a fee award, the frivolousness of Plaintiff's copyright claim and his bad faith in bringing it weigh most heavily.  Defendants are entitled to attorneys' fees under the Copyright Act.

### 2.     Defendants Fail To Submit Evidence Supporting An Award

The Court cannot grant Defendants' Requests for Attorneys' Fees, however, because Defendants omit the necessary evidentiary support.  Defendant Robert Weinstein requests an award of $19,973 in attorneys' fees incurred defending this action.  (RW Mot. at 10.)   Defendant Sara Weinstein requests an award of $51,180.   (SW Mot. at 14.) Defendants support their requests with brief statements from counsel setting forth their billing rates and billable hours.  (RW Mot., Farrell Decl. ¶ 4; SW Mot., Belilove Decl. ¶ 7.)  This showing is inadequate.

The Copyright Act only provides for attorneys' fees attributable to defending against copyright and related claims.  *See The Traditional Cat Ass'n, Inc. v. Gilbreath*, 340 F.3d 829, 833 (9th Cir. 2003).   Detailed billing records are generally required to assist the Court in its determination of reasonable fees.  *See, e.g.*, *Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1232 (9th Cir. 1997) ("[T]he district court abused its discretion by not requiring . . . original time records and billing statements.").

In *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975), the Ninth Circuit set forth 12 factors, taken from *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), that a district court must evaluate in determining reasonable attorneys' fees:   (1) the time and labor required, (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case;

(11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

The Ninth Circuit "has since relaxed the standard, saying that application of at least some of, or the most relevant, factors may be sufficient for review on appeal." *Jordan v. Multnomah County*, 815 F.2d 1258, 1263 n.11 (9th Cir. 1987) (citing, *inter alia*, *Harris v. McCarthy*, 790 F.2d 753, 758 (9th Cir. 1986), which affirmed a fee award based on the district court's consideration of three factors); *see also Davis v. City and County of San Francisco*, 976 F.2d 1536, 1546 (9th Cir. 1992) ("In determining an appropriate market rate, a district court may make reference to the [*Kerr*] factors . . . ."), *vacated in part on other grounds*, 984 F.2d 345 (9th Cir. 1993). The Supreme Court has deemed one factor—the fixed or contingent nature of the fee—irrelevant to the fee calculation, and has cast doubt on the relevance of an additional factor—a case's "undesirability." *Davis*, 976 F.2d at 1546 n.4 (citing *City of Burlington v. Dague*, 505 U.S. 557, 563, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992)).

Defendants do not explain why the non-copyright claims are sufficiently "related" as to qualify for fees under the Copyright Act. In addition, Defendants fail to submit the detailed billing records that would allow the Court to determine whether the hours expended on the applicable claims were reasonable. Finally, Defendants do not address any of the *Kerr* factors. In any amended motion, Defendants should include this information and should avoid overreaching.

## V.

## CONCLUSION

In light of the foregoing:

1. Defendants' Motions for Summary Judgment are GRANTED;

2. Defendants' Requests for Attorneys' Fees are DENIED without prejudice; and

3.      Defendants shall lodge a proposed judgment within 10 days from the date of
this Order.

**IT IS SO ORDERED**.

DATED:      February 10, 2011

_____
                          DOLLY M. GEE
                          UNITED STATES DISTRICT JUDGE